Filed 12/5/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>       v.<br><br>TIREE AUSTIN JARMEL HALL,<br><br>    Defendant and Appellant. | F087187<br><br>(Super. Ct. No. 22CMS4412)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kings County. Michael J. Reinhart, Judge.*

Nicholas J. Seymour, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill and Caitlin Franzen, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

* For unexplained reasons, both parties have captioned this appeal as being taken from a judgment purportedly imposed by Kings County Superior Court Judge Valerie R. Chrissakis. However, Judge Chrissakis was not the trial judge, did not make the evidentiary rulings at issue in this appeal, nor was she the judge who subsequently imposed judgment. The record instead indicates that Judge Chrissakis's only involvement in this case was arraigning appellant Hall on the original felony complaint in October 2022, a year before the trial and the ultimate imposition of judgment in 2023.

A jury convicted appellant Tiree Austin Jarmel Hall of one felony count of inflicting corporal punishment or injury on a child (minor T.E.) (Pen. Code, § 273d, subd. (a)), one misdemeanor count of child abuse as to a different child (minor A.F.) (Pen. Code, § 273a, subd. (b)), and one misdemeanor count of resisting, delaying, or obstructing a peace officer in the discharge of their duties (Pen. Code, § 148, subd. (a)(1)).  The trial court suspended imposition of sentence and placed Hall on probation with various terms and conditions.

Hall appeals, raising a two–part evidentiary contention:

(1)  The trial court erred by admitting the hearsay statements the two non–testifying children made to police at the scene by virtue of its findings that those statements — and the police officers' body–camera recordings of them — were nonetheless admissible under *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*) and *Ohio v. Clark* (2015) 576 U.S. 237 (*Clark*).

(2) The trial court also erred by alternatively finding that the children's statements were independently admissible because their unavailability to testify at trial was engendered by Hall's intentional efforts such that any constitutionally–based *Crawford* challenges were thereby forfeited under Evidence Code[1] section 1390 and *Giles v. California* (2008) 554 U.S. 353 (*Giles*).

Hall concludes that without the children's statements his convictions on the two child abuse counts lacked evidentiary support.  On this point the People do not disagree and instead contend that both the trial court's evidentiary rulings were correct.  Simply put, the admissibility of the children's hearsay statements is the only issue on appeal. Although easily stated, however, the issue is not so quickly resolved.

---

[1] All undesignated statutory references are to the Evidence Code.

2.

## FACTUAL BACKGROUND

### A. The Offenses

Because Hall does not otherwise contest the underlying sufficiency of the evidence adduced at trial to support his convictions — assuming the children's statements were properly admitted — and his appellate claim is instead rooted in the trial court's admissibility rulings, we need only briefly summarize the basic facts, construing them as we must " 'in the light most favorable to the judgment.' " (*People v. Curl* (2009) 46 Cal.4th 339, 342, fn. 3.)

Hall and Deanna English were domestic partners and resided together with three children: eight–year–old son T.E., a three– or four–year–old child (who is not involved in this case), and 11–year–old daughter A.F.

In October 2022, English called 911 and requested police assistance. In the background, T.E. could be heard crying and the 911 recording includes what seems to be English arguing with Hall before the call was abruptly terminated. Police officers Brandon Gresham and Sadie Risk responded and when they arrived Gresham could hear an adult male voice yelling from inside the house. Gresham went to the front door and knocked several times. He saw Hall walk by the window located next to the front door, go to the door several times, but only to walk away.

Gresham said he also watched as Hall made a "swishing, a shooing motion" at A.F. to make her leave. Still outside, Gresham called out whether everything was okay, to which A.F. replied, "No, everything's not okay." Gresham asked her if anyone had hit her mother and A.F. replied, "No, he didn't hit my mom."

Hall finally opened the door, came outside, and told the officers that everything was fine, that English did not want to talk to them, and that the officers were not going to be " 'coming into my house.' " One of the officers told A.F. to go ask English if she wanted to speak with the police "because it was obvious [English] didn't want to come

3.

out" and talk to them. A.F. went back and when she returned she told Gresham that English wanted them to come inside to talk to her.

While Gresham dealt with the increasingly recalcitrant Hall, Officer Risk went in and found English and T.E. in the bathroom. English told Risk that she did not know what had happened. Risk noticed that T.E. was scared, crying, and would not let go of his mother. T.E. told Risk that he and his sister were "yell talking" to each other and that Hall had thought that they were arguing and shouted at them to stop. He said Hall then hit him in the face, mouth, and leg with a belt. Risk noticed that T.E.'s mouth was swollen, and he had a scratch over his eyebrow.

Risk then spoke to A.F., who seemed "very concerned." A.F. explained to Risk that Hall had told her to help T.E. clean his room. A.F. went to help T.E. and they started to argue. T.E. accidentally poked himself in the eye with his finger and started to cry. Hall came in, grabbed a belt and told T.E. to stop crying. A.F. said Hall then "lost control," and hit T.E. with the belt "really, really hard."

A.F. said Hall then also hit her with the belt. Although he tried to hit her in the face, she was able to block that blow with her arms. She added that Hall had also hit her in other places and showed Risk her knee. Risk said she observed a "V–shaped scratch or cut" on A.F.'s leg, a small scratch on her right arm, and a scratch on her right ankle. As discussed further below, neither English, T.E., nor A.F. testified at trial. Hall also did not testify at trial, and the defense rested without presenting any affirmative evidence.[2]

### B. The Evidentiary Rulings

On May 3, 2023,[3] district attorney investigator Brett Ward went to a local elementary school to serve Hall with trial subpoenas for T.E. and another child, minor

---

[2] Hall does not challenge the Penal Code section 148, subdivision (a)(1) resisting/obstructing/interfering misdemeanor conviction and we need not relate any additional supporting facts.

[3] All subsequent date references are to 2023.

4.

D.H.[4]  Ward handed the subpoenas to Hall through the passenger door window of Hall's van, and Hall responded by simply throwing the subpoenas out the driver–side window onto the street.  Neither A.F. nor English was present in the van on this occasion.

On May 5, Ward located English, who was sitting with Hall in the same van. Ward handed English a subpoena for her as well as the subpoenas for T.E. and D.H.  Hall took the subpoenas from English, again threw them out the window, and drove away.[5] Later that day, the district attorney's office received separate phone calls from Hall and English.  Both complained that they were unhappy about having been served with the subpoenas.

On May 18, Ward attempted to serve English with a subpoena for A.F.  English lied and told Ward that *her* name was in fact A.F.  When Ward told English that he had a subpoena for A.F. and handed it to her, in a seemingly recurring theme, English threw the subpoena out the van window and drove away.  Ward picked up the subpoena and followed the van.  At Ward's request, assisting local police officers pulled English over and Ward again gave her the subpoena.  Hall was not present during this episode, but English told Ward that she would not bring her children to court.

On May 19, Hall and his counsel appeared in court before Judge James E. Oakley[6] for a trial readiness hearing and an arraignment on an amended information.  Defense counsel and the prosecutor both announced they were ready to be sent out for trial.  Hall

---

[4] Ward explained that minors may only be subpoenaed through service on a parent or guardian.  The record is incomplete in this regard, but minor D.H. was apparently the other child who is not relevant to our discussion.  Neither parties' briefing nor the record reveals why this child was subpoenaed.  Although the subpoenas themselves are not in the record, Hall does not contest their sufficiency.

[5] These subpoenas are also not in the record, but again Hall does not contest their adequacy.

[6] Judge Oakley is a retired judge of the Madera Superior Court who was sitting on assignment by the Chief Justice.

interrupted the proceedings and told Judge Oakley, "For the record I had a problem yesterday. [The district attorney's] investigator almost broke the window with my kids in the car yesterday. I don't — I take that as disrespect, and if I would have been in the car, it would have been a big problem. I would probably have had big felony charges…. [¶] The [prosecutor] is out of pocket. *She don't know what no means. No means no*." (Italics added.)

Trial commenced in front of Judge Reinhart on May 22 with jury selection and other pretrial matters, but on May 23 neither English nor the children appeared in court as ordered by the subpoenas. The trial court had issued a body attachment order/arrest warrant for English the day before, but she had not been located. Ward testified that neither T.E. nor A.F. had been in school since he had served English with their subpoenas on May 18.

On May 24, Ward testified he had still been unable to locate English. He had driven by their house several times, but the van was not there. Ward added that Hall had said several times that English was off taking care of her sick mother, but when Ward contacted English's mother up in Vallejo, she said she had not been sick, was in fact then at work, and that she did not know where English was either.

The prosecutor moved to admit T.E.'s and A.F.'s statements to Gresham and Risk, arguing they were admissible hearsay under sections 240, 1250, 1360, and 1390. She further argued that the children's statements were nontestimonial under *Crawford, supra,* because they had been made during an ongoing emergency. Finally, she argued that Hall had forfeited any opportunity to confront and cross–examine the children under *Crawford* because he had been complicit in their unavailability.

Defense counsel objected, arguing both that the children's statements were testimonial under *Crawford* and that it was English — not Hall — who was responsible for not bringing the children to court so Hall could not have forfeited his confrontation rights merely based on English's actions.

Addressing the basic hearsay nature of the children's statements, the trial court first ruled that:

> "[T]o the extent that [they are] statements by the minors regarding their physical condition and injuries, the hearsay exception under [section] 1250 would make [them] admissible past [a] hearsay objection.
>
> "Now as to all of these statements, analyzing them under [section] 1360, both minors are under the age of 12, the circumstances of each of the statements indicates to this Court reliability, which includes but is not limited to the demeanor of each minor when they were giving the statements and the circumstances under which they made the statement.
>
> "The Court will find that each of these minors is unavailable as defined in [section] 240. The People have properly served the — both parents and there was a failure to appear. In fact, the record would indicate that the mother currently has a body attachment [order] for failing to appear.
>
> "Also I would find that there is corroboration that exists for their statements that is the — is not limited to the physical injuries that each displayed, which corroborates their statements regarding how they received them and from whom."

Moving to the Sixth Amendment *Crawford* issue, the trial court found:

> "First of all, [T.E.'s initial statement] is not a statement to the police officers it's the minor [T.E.'s] statement to his mother. The circumstances under which that was made … was to the mother, not in response to a question by the police made in the minor's home. That would clearly not be testimonial.
>
> "Now as to all the [other] statements by [T.E. and A.F.], the Court has reviewed [*Clark*, citation]. Under that analysis from [*Clark*], it appears to the Court that neither minor child intended their statements to be testimonial, their purpose was simply to stop the abuse. And with the other issues of indicia of reliability under [*Clark*], this would not be testimonial. And there's some interesting discussions in [*Clark*] and other cases that came after that regarding whether statements by minors at the time of the confrontation clause was enacted, there is historical precedent that at that time the confrontation clause did not apply to minor statements regarding abuse. [¶] So under that rationale, this would not be violative of [*Crawford*]."

7.

Lastly, as to the prosecutor's forfeiture by wrongdoing argument, the trial court concluded:

> "Now in addition to that, the Court analyzed the forfeiture issues raised pursuant to [section] 1390. The Court is persuaded by the evidence presented by the People. They have met their — exceeded their burden of proof, which is preponderance of the evidence that the circumstantial evidence is such that the [Hall] did engage or aided and abetted the unavailability of the two minor witnesses. And as I have previously stated, the circumstances under which and the manner in which the statements were made by the minor do indicate to the Court that they bear indicia of trustworthiness and reliability, and having procured the unavailability of the two declarant minors, [they] would also be admissible under [section] 1390."

Thereafter, because neither child was present at trial, their statements were admitted into evidence through the officers' direct testimony and their accompanying body–camera recordings.

## DISCUSSION

## I.  The Hearsay Rule, Its Exceptions, and *Crawford v. Washington*

### A. Legal Background

Evidence of a statement made other than by a witness testifying at the hearing that is offered for the truth of the matter stated is hearsay and not admissible unless there is an exception. (§ 1200, subds. (a) & (b); *People v. Valencia* (2021) 11 Cal.5th 818, 831 (*Valencia*).) Even so, the hearsay rule, whether at common law or statutorily, has a long legacy of exceptions in various forms and variations among the many Anglo–American jurisdictions. (See, e.g., Cal. Evid. Code, §§ 1220–1390.)

Here, the trial court initially rejected any basic hearsay objections to the admission of the children's statements, finding exceptions applied under sections 1250, 1360, and 240.[7] On appeal, Hall does not contest these basic statutory rulings. Rather, Hall's focus is on the trial court's additional Sixth Amendment findings and rulings. Thus, so is ours.

---

[7]  Section 1250 provides that: "Subject to Section 1252, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a

In criminal matters, and traditional exceptions to the hearsay rule notwithstanding, "[t]he Sixth Amendment provides that '[i]n all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him.' The Amendment contemplates that a witness who makes testimonial statements admitted against a defendant will ordinarily be present at trial for cross–examination, and that if the witness is unavailable, his prior testimony will be introduced only if the defendant had a prior opportunity to cross–examine him." (*Giles, supra,* 554 U.S. at pp. 357–358; *People v. Tran* (2022) 13 Cal.5th 1169, 1194–1195 (*Tran*); *Valencia, supra,* 11 Cal.5th at p. 830.)[8]

statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant." (§ 1250, subd. (a).) In turn, section 1252 qualifies section 1250 by stating that: "Evidence of [such a] statement is inadmissible … if the statement was made under circumstances such as to indicate its lack of trustworthiness." (§ 1252.)

Specific to certain child abuse or neglect cases, section 1360 provides in part that: "In a criminal prosecution where the victim is a minor, a statement made by the victim when under the age of 12 describing any act of child abuse or neglect performed with or on the child by another … is not made inadmissible by the hearsay rule if all of the following apply: [¶] (1) The statement is not otherwise admissible by statute or court rule. [¶] (2) The court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide sufficient indicia of reliability. [¶] (3) The child either: [¶] (A) Testifies at the proceedings. [¶] (B) Is unavailable as a witness, in which case the statement may be admitted only if there is evidence of the child abuse or neglect that corroborates the statement made by the child." (§ 1360, subd. (a).) Section 1360 specifically applies to both of the child abuse offenses with which Hall was charged and convicted here. (See § 1360, subd. (c).)

Lastly, section 240 defines "unavailability" as including when the hearsay declarant is "[a]bsent from the hearing and the court is unable to compel [their] attendance by its process" (§ 240, subd. (a)(4)), *or* "[a]bsent from the hearing and the proponent of [their] statement has exercised reasonable diligence but has been unable to procure [their] attendance by the court's process" (§ 240, subd. (a)(5).)

[8] The Sixth Amendment's Confrontation Clause "is binding on the States through the Fourteenth Amendment." (*Clark, supra,* 576 U.S. at p. 243.)

9.

Consequently, in its 2004 *Crawford* decision, the United States Supreme Court " ' "dramatically departed" ' from confrontation clause precedent, which had generally permitted statements of unavailable witnesses to be admitted at trial so long as these statements were reliable enough." (*Tran, supra,* 13 Cal.5th at p. 1195.)  Instead, the high court held that in criminal prosecutions, the Sixth Amendment "bars 'admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'  A critical portion of this holding … is the phrase '*testimonial statements*.'  Only statements of this sort cause the declarant to be a 'witness' within the meaning of the Confrontation Clause.  [Citation.]  It is the *testimonial character* of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." (*Davis v. Washington* (2006) 547 U.S. 813, 821 (*Davis*), italics added; see also *Whorton v. Bockting* (2007) 549 U.S. 406, 420 ["the Confrontation Clause has no application" to *nontestimonial* statements]; cf. *People v. Fayed* (2020) 9 Cal.5th 147, 168 [*nonhearsay* statements " 'raise[] no Confrontation Clause concerns,' " citing *Tennessee v. Street* (1985) 471 U.S. 409, 414].)

Accordingly, "[a] statement is testimonial hearsay only if it is (1) hearsay under a traditional hearsay inquiry and (2) testimonial within the meaning of *Crawford* and its progeny." (*People v. Perez* (2018) 4 Cal.5th 421, 455 (*Perez*).)  "The first step is a traditional hearsay inquiry… .  If a hearsay statement is being offered by the prosecution in a criminal case, and the *Crawford* limitations of unavailability, as well as cross–examination or forfeiture, are not satisfied, a second analytical step is required.  Admission of such a statement violates the right to confrontation if the statement is *testimonial hearsay*, as the high court defines that term." (*People v. Sanchez* (2016) 63 Cal.4th 665, 680 (*Sanchez*), original italics.)

Even so, the meaning of the term "testimonial" is far from manifest.  Indeed, "*Crawford* set forth '[v]arious formulations' of the core class of ' "testimonial" '

10.

statements, [citation], but found it unnecessary to endorse any of them, because 'some statements qualify under any definition,' [citation]. Among those … were '[s]tatements taken by police officers in the course of *interrogations*,' [citations]. … We … did not define [the term "interrogation" either], except to say that '[w]e use [it] … in its colloquial, rather than any technical legal, sense,' and that 'one can imagine various definitions …, and we need not select among them in this case.' " (*Davis, supra,* 547 U.S. at p. 822, italics added.) That said, the *Davis c*ourt then attempted "to determine more precisely which police interrogations produce testimony." (*Ibid.*)[9]

Since *Davis*, we at least know that "a statement does not fall within the ambit of the [Confrontation] Clause when it is made 'under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.' [Citation.] … [A] person who makes a statement to resolve an ongoing emergency is not acting like a trial witness because the declarant's purpose is not to provide a solemn declaration for use at trial, but to bring an end to an ongoing threat. [Citation.] … '[T]he prospect of fabrication … is presumably significantly diminished' when a statement is made under such circumstances, [citation], and that reliability is a salient characteristic of a statement that falls outside the reach of the Confrontation Clause, [citation]…. [I]f a statement is not made for 'the primary purpose of creating an out–of–court substitute for trial testimony,' its admissibility 'is the concern of state and federal rules of evidence, not the Confrontation Clause.' " (*Williams v. Illinois* (2012)

---

[9] *Davis* and *Hammon v. Indiana* were decided together at 547 U.S. 813, and both "dealt with statements given to law enforcement officers by the victims of domestic abuse." (*Clark, supra,* 576 U.S. at p. 244.) "The victim in *Davis* made statements to a 911 emergency operator during and shortly after her boyfriend's violent attack. In *Hammon*, the victim, after being isolated from her abusive husband, made statements to police that were memorialized in a ' " 'battery affidavit.' " ' [Citation.] [¶] We held that the statements in *Hammon* were testimonial, while the statements in *Davis* were not." (*Clark, supra,* 576 U.S. at p. 244.)

11.

567 U.S. 50, 83–84 (plur. opn. of Alito, J.), quoting *Michigan v. Bryant* (2011) 562 U.S. 344, 359 (*Bryant*).)

Moreover, any such inquiry must also consider all of the surrounding facts because "there may be *other* circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out–of–court substitute for trial testimony." (*Bryant, supra,* 562 U.S. at p. 358, original italics.) In other words, "the existence *vel non* of an ongoing emergency is not the touchstone of the testimonial inquiry." (*Id.* at p. 374.) Instead, "whether an ongoing emergency exists is simply one factor … that informs the ultimate inquiry regarding the 'primary purpose' of an interrogation." (*Id.* at p. 366.)

Our own Supreme Court has itself "derive[d] several basic principles from *Davis*. First … the confrontation clause is concerned solely with hearsay statements that are testimonial, in that they are out–of–court analogs, *in purpose and form*, of the testimony given by witnesses at trial. Second, though a statement need not be sworn under oath to be testimonial, it must have occurred under circumstances that imparted, to some degree, the *formality and solemnity characteristic of testimony*. [Fn.] Third, the statement must have been given and taken *primarily for the purpose ascribed to testimony* — to establish or prove some past fact for possible use in a criminal trial. Fourth, the primary purpose for which a statement was given and taken is to be determined 'objectively,' considering all the circumstances that might reasonably bear on the *intent of the participants* in the conversation. [Fn.] Fifth, sufficient formality and solemnity are present when, in a nonemergency situation, one responds to questioning by law enforcement officials, where deliberate falsehoods might be criminal offenses. Sixth, statements elicited by law enforcement officials are not testimonial if the *primary purpose* in giving and receiving them is to deal with *a contemporaneous emergency*, rather than to produce evidence about past events for possible use at a criminal trial." (*People v. Cage* (2007) 40 Cal.4th 965, 984 (*Cage*), italics added.)

12.

Simply phrased, "the proper focus is not on the mere reasonable chance that an out–of–court statement might later be used in a criminal trial. Instead, we are concerned with statements, made with some formality, which, *viewed objectively*, are for the *primary purpose* of establishing or proving facts for possible use in a criminal trial." (*Cage, supra,* 40 Cal.4th at p. 984, fn. 14.)

**B. Standard of Review**

Because Hall objected to the admission of the children's statements at trial on *Crawford* grounds, the prosecutor, "as the proponent of the evidence, … had the burden to show the challenged testimony did not relate testimonial hearsay." (*People v. Ochoa* (2017) 7 Cal.App.5th 575, 584; *Idaho v. Wright* (1990) 497 U.S. 805, 816 [the question is whether the prosecution "as the proponent of evidence presumptively barred by the hearsay rule and the Confrontation Clause, ha[d] carried its burden of proving" the contrary].) Here, the trial court found that the prosecutor had met that burden.

"On appeal, we independently review whether a statement was testimonial, implicating the constitutional right of confrontation." (*People v. Ramirez Ruiz* (2020) 56 Cal.App.5th 809, 825 (*Ramirez Ruiz*).) In doing so, "[w]e evaluate the primary purpose for which the statement was given and taken under an objective standard, 'considering all the circumstances that might reasonably bear on the intent of the participants in the conversation.' " (*People v. Nelson* (2010) 190 Cal.App.4th 1453, 1466, citing *Cage, supra,* 40 Cal.4th at p. 984.)

**C. Analysis**

Hall argues the trial court's conclusion that the children's statements to Gresham and Risk were not testimonial was prejudicial error and their statements should have instead been excluded under *Crawford*. We are not persuaded.

When as here, two police officers were responding to a 911 hang–up call, we must first look to the underlying circumstances and the statements and actions of all the involved parties in order to determine "the primary purpose of *both officer[s] and*

13.

*declarant[s],*" and objectively do so based on " 'the purpose that *reasonable participants* would have had[.]' " (*People v. Blacksher* (2011) 52 Cal.4th 769, 813–814, italics added.)

"Furthermore, we 'should consider whether an " 'ongoing emergency' " exist[ed], or appear[ed] to exist, when the statement[s] w[ere] made,' even 'if hindsight reveals that an emergency did not, in fact, exist.' [Citation.] 'Whether an ongoing emergency exists is a "highly context–dependent inquiry" ' that may take into account whether the victim[s], first responders, or the public remain at risk. [Citation.] Also, 'regardless of the existence of an emergency, the informality of the statement[s] and the circumstances of [their] acquisition are important considerations.' " (*Ramirez Ruiz, supra,* 56 Cal.App.5th at p. 825; see also *Sanchez, supra,* 63 Cal.4th at p. 689 ["[t]estimonial statements are those made primarily to memorialize facts relating to past criminal activity, which could be used like trial testimony" while nontestimonial statements "are those whose primary purpose is to deal with an ongoing emergency or some other purpose unrelated to preserving facts for later use at trial"].)

*Clark, supra,* is itself enlightening. There the high court found that statements from a three–year–old child to his teachers, who suspected the child had been abused, were not testimonial and did not violate the confrontation clause. The court first noted that the child's "statements occurred in the context of an ongoing emergency involving suspected child abuse." (*Id.,* 576 U.S. at p. 246.) The teachers' immediate concern was whether it was safe to release the child back to his guardian. (*Ibid.*)

The court further observed that *the teachers' questions and the child's answers* "were primarily aimed at identifying and ending the threat." (*Clark, supra,* 576 U.S, at p. 247; cf. *Bryant, supra*, 562 U.S. at p. 361, fn. 8 [the analysis must be made from "the perspective of the parties to the interrogation at the time, not with the benefit of hindsight"].) There was "no indication that the primary purpose of the conversation was to gather evidence" for the defendant's prosecution. (*Clark, supra,* 576 U.S. at p. 247.)

14.

The teachers never told the child "that his answers would be used to arrest or punish his abuser. [The child] never hinted that he intended his statements to be used by the police or prosecutors." (*Ibid.*) Finally, the court added that the conversation "was informal and spontaneous." (*Ibid.*) So too here.

Notably, the *Clark* court also emphasized that the child's age "fortifie[d]" a conclusion the statements were not testimonial, and commented that "[s]tatements by very young children will *rarely, if ever*, implicate the Confrontation Clause." (*Id.*, 576 U.S. at pp. 247–248, italics added.) Indeed, it was "extremely unlikely" a three–year–old child in this situation "would intend his statements to be a substitute for trial testimony. On the contrary, a young child in these circumstances would simply want the abuse to end, would want to protect other victims, or would have no discernible purpose at all." (*Id.* at p. 248.)[10]

While it is true that T.E. was eight and A.F. was 11, and not three as in *Clark,* and that it was a police officer, not a teacher, who obtained the statements at issue, the Supreme Court's underlying point remains equally cogent: the age of a child declarant is a highly probative consideration in assessing whether his or her statements were *intended by him or her to be testimonial*.

This was not at all a situation like that in *People v. Kerley* (2018) 23 Cal.App.5th 513 (*Kerley*), where statements made by a domestic violence victim from the safety of a police station were "clearly testimonial." (*Id.* at p. 551.) Rather, when viewed from the objective perspective of a then–existing emergency following a 911 call, along with Hall's less–than cooperative behavior that had exacerbated that emergency, the children's

---

[10] The *Clark* court added that "[a]s a historical matter … there is strong evidence that statements made in circumstances similar to those [in Clark's case] were admissible at common law. [Citations.] … It is thus highly doubtful that statements like [the Clark child's] ever would have been understood to raise Confrontation Clause concerns." (*Clark, supra,* 576 U.S. at p. 248.) This too informs our analysis.

ages, their visible injuries and emotional states, we find the children's statements here were not testimonial.

## II. Forfeiture by Wrongdoing

The trial court independently rejected Hall's *Crawford* claim based on its findings that it had been forfeited by Hall's causing, and aiding and abetting English, in the children's unavailability at trial. Hall contends the court erred in doing so but we once more disagree.

### A. Legal Background

In California, section 1390 codifies the forfeiture by wrongdoing exception to the hearsay rule. It "outlines an exception to the hearsay rule for statements that are offered against a party involved in causing the unavailability of the [hearsay] declarant as [a] witness." (*People v. Quintanilla* (2020) 45 Cal.App.5th 1039, 1049 (*Quintanilla*).)

Specifically, section 1390 states that: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement is offered against a party that has engaged, or aided and abetted, in the wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." (§ 1390, subd. (a).) The party seeking to introduce a hearsay statement under section 1390 bears the burden of proving its applicability by a preponderance of the evidence, and this proof may not be solely based on the statement of the unavailable declarant, but must instead also be supported by independent corroborative evidence. (*Id.*, subd. (b)(1) & (b)(2).) When deciding whether or not to admit the statement, the court "may take into account whether it is trustworthy and reliable." (*Id.,* subd. (b)(4).)[11]

---

[11] Compare rule 804(b)(6) of the Federal Rules of Evidence (28 U.S.C.), "Statement Offered Against a Party That Wrongfully Caused the Declarant's Unavailability," which similarly codifies the forfeiture by wrongdoing doctrine as a hearsay exception in the federal courts. (*Giles, supra,* 554 U.S. at p. 367.)

Even though it originated in a common law forfeiture by wrongdoing principle, a criminal defendant also forfeits any Sixth Amendment confrontation rights when, by his or her wrongful acts, the defendant makes a witness unavailable to testify at trial. (*Giles, supra,* 554 U.S. at p. 355; see *Davis, supra,* 547 U.S. at p. 833–834 ["[W]hen defendants seek to undermine the judicial process by procuring or coercing silence from witnesses and victims, the Sixth Amendment does not require courts to acquiesce … [and] *Crawford* … did not destroy the ability of courts to protect the integrity of their proceedings."].)

Unlike *Crawford*'s landmark 2004 confrontation clause decision, the *constitutional* basis for the forfeiture by wrongdoing doctrine is not recently divined. Its sources not only pre–date the Sixth Amendment itself but also appear in pre–*Crawford* Supreme Court jurisprudence: "The Constitution does not guarantee an accused person against the legitimate consequences of his own wrongful acts. It grants him the privilege of being confronted with the witnesses against him; but if he voluntarily keeps the witnesses away, he cannot insist on his privilege. If, therefore, when absent by his procurement, their evidence is supplied in some lawful way, he is in no condition to assert that his constitutional rights have been violated." (*Reynolds v. United States* (1879) 98 U.S. 145, 158 (*Reynolds*), citing English common law authority, including, e.g., *Lord Morley's Case*, 6 How. St. Tr. 769, 771 (H. L. 1666).)

Indeed, *Reynolds* was approvingly cited more than a century later in *Giles, supra,* 554 U.S. at p. 366, as well as even in *Crawford* itself. (*Crawford, supra,* 541 U.S. at p. 62 ["the rule of forfeiture by wrongdoing (*which we accept*) extinguishes confrontation claims on essentially equitable grounds," italics added, citing *Reynolds, supra,* 98 U.S. at pp. 158–159].) In other words, *Reynolds'* 1879 vintage has not affected its continued constitutional viability.

Accordingly, it is thus well–settled that a defendant may "forfeit a confrontation clause challenge by engaging in wrongdoing that renders the [hearsay] declarant

17.

unavailable with an intent to prevent that declarant's in–court testimony." (*Perez, supra,* 4 Cal.5th at p. 455, fn. 3.) *Crawford*'s Sixth Amendment cautions and guardrails are simply not applicable when a defendant's intentional actions have caused a hearsay declarant's unavailability, because "one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation." (*Davis, supra,* 547 U.S. at p. 833.)

## B. Standard of Review

Although *Davis* did not specifically address "the standards necessary to demonstrate such forfeiture" in the trial court, it did note that both state and federal courts "have generally held the [prosecution] to the preponderance-of-the-evidence standard[.]" (*Davis, supra,* 547 U.S. at p. 833; see also *People v. Merchant* (2019) 40 Cal.App.5th 1179, 1185–1186 (*Merchant*) ["California courts have since [*Davis*] adopted a preponderance standard for evaluating forfeiture by wrongdoing."].) Here, aware of that burden of proof, the trial court found that the prosecutor had "exceeded" it.

When the "disputed issue is whether the trial court erred in finding that a defendant engaged in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness, we apply a substantial evidence standard in reviewing the trial court's finding regarding the defendant's intent. [Citations.] Although we apply a substantial evidence standard of review to the trial court's factual finding, '[w]e review for abuse of discretion the [court's] ultimate decision whether to admit the evidence.' " (*Quintanilla, supra,* 45 Cal.App.5th at p. 1050; see also *Merchant, supra,* 40 Cal.App.5th at p. 1186 [in reviewing a finding of forfeiture by wrongdoing under the confrontation clause, "[w]e evaluate whether there is sufficient evidence from which the trial court could make its [factual] finding[s] on a preponderance standard"].)

## C. Analysis

As discussed, forfeiture by wrongdoing permits admission of unconfronted statements of an unavailable witness "if the trial judge finds by a preponderance of the

evidence that the defendant by a wrongful act made the witness unavailable with the intent of preventing the witness from testifying." (*Kerley, supra,* 23 Cal.App.5th at p. 549.) "The goal of the doctrine was to remove the 'otherwise powerful incentive for defendants to intimidate, bribe, and kill the witnesses against them — in other words, it is grounded in "the ability of courts to protect the integrity of their proceedings." ' " (*Id.* at p. 550.)

"Whether a defendant's conduct constitutes 'wrongdoing' depends not necessarily on its character, but on the defendant's intent and whether his actions caused the witness not to appear." (*People v. Reneaux* (2020) 50 Cal.App.5th 852, 868 (*Reneaux*), superseded by statute on other grounds as stated in *People v. Cota* (2020) 97 Cal.App.5th 318, 334.) While "[i]t is true that most of the reported cases involving this exception to the confrontation clause involve serious criminal conduct … that does not preclude courts from finding that nonthreatening conduct … qualifies as wrongdoing under the appropriate legal standard where the defendant acted with the intent to procure the witness's absence from court." (*Reneaux, supra,* 50 Cal.App.5th at p. 868; see also *United States v. Blackshire* (9th Cir. 2024) 98 F.4th 1146, 1152 ["the government need not show that [the defendant] engaged in *criminal* wrongdoing that caused [the victim's] unavailability," original italics].)

Instructive here is *Carlson v. Attorney General of California* (9th Cir. 2015) 791 F.3d 1003 (*Carlson*): "One early Sunday afternoon, [witness] called the [police] to report that his stepfather, [Carlson], had hit [Carlson's] seven-year-old [son] in the face. When [an officer] arrived on the scene, he observed redness and bruising on [son's] left cheek. [Carlson was] charged … with willful infliction of harm or injury to a child, [Pen. Code, section] 273a(b)." (*Carlson, supra,* 791 F.3d at p. 1004.)

As in the current case, Carlson's wife and the victim son were subpoenaed to testify at trial but did not appear. After an evidentiary hearing, and relying on the forfeiture by wrongdoing exception, the trial court admitted the wife's and son's

statements to police, finding that Carlson was complicit in their absence and had thereby surrendered his Sixth Amendment right to confront them. "Accordingly, the trial judge allowed [an officer] to testify to statements made by [victim son] and [wife] in the hours after the incident." (*Carlson, supra,* 791 F.3d at p. 1004.)

The Ninth Circuit opinion examined the history of the forfeiture by wrongdoing doctrine in the context of Carlson's federal habeas corpus petition after the California courts had rejected his challenges to his conviction. (*Carlson, supra,* 791 F.3d at pp. 1009–1010.) The court affirmed, concluding the trial court's forfeiture determination was not unreasonable. (*Id.* at pp. 1004–1005.) It found that the evidence was sufficient for the trial court to have reasonably inferred that Carlson knew where his wife and child were, that he wanted to keep their whereabouts secret so they could not be compelled to appear, and that he wished to keep his wife away from any influence that might persuade her to reappear. (*Carlson, supra,* 791 F.3d at pp. 1005–1007.)[12]

In its discussion, the *Carlson* court observed that *Reynolds, supra,* had also described salient similar facts and analogized to that case for support. (*Carlson, supra,* 791 F.3d at pp. 1012–1013.) We likewise find *Reynolds'*s facts helpful here, particularly in light of an additional facet of the facts present in the current case: "In *Reynolds*, … the defendant had told an officer looking for a witness that the witness was not home, when the facts suggested that she was, and informed the officer that the witness would 'not appear in this case.' [Citation.] The facts in *Reynolds* in some respects more strongly supported the inference of wrongful procurement — there, the defendant directly rebuffed law enforcement's efforts to locate a witness[.]" (*Carlson, supra,* 791 F.3d at p. 1012.) So too here; Hall's lies about English's whereabouts and her mother's supposed illness in Vallejo are quite probative in this regard.

_____

**12** Notably, there was no dispute in *Carlson* as to whether the wife and child's statements to police were testimonial under *Crawford*; they unquestionably were. (*Carlson, supra,* 791 F.3d at p. 1009.)

The *Carlson* court ultimately concluded that "the facts supporting a finding of wrongful procurement [were] at least as strong as those in *Reynolds* [and like] the facts in *Reynolds*, those circumstances demonstrate both concealment of the witnesses' whereabouts and insulation of the witnesses from the reach of either compulsion or persuasion regarding showing up at trial. … Overall, then, the facts in this case are approximately as strong in suggesting active involvement in the witnesses' nonappearance as those in *Reynolds* — or, at least, a reasonable jurist could so conclude." (*Carlson, supra,* 791 F.3d at p. 1013.) Even though the evidence in *Carlson* was "essentially circumstantial," the "applicable trial court burden of proof … was preponderance of the evidence, not proof beyond a reasonable doubt." (*Id.* at p. 1012.) It was sufficient in *Carlson* and *Reynolds* and we find it is even more so here.

Hall insists that the children's unavailability was caused by English, whom he now labels a mere "third party," and it should not thereby be attributed to him.

First, however, the rule equally applies to one who is "*involved in* causing the unavailability" of the witness. (*Quintanilla, supra*, 45 Cal.App.5th at p. 1049, italics added; see also § 1390, subd. (a) [when "the statement is offered against a party that has engaged, *or aided and abetted*, in the wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness," italics added].)

Second, here both Hall and English unequivocally demonstrated their collective resolve to not let the children come to court by repeatedly throwing their subpoenas out the van's window, later both calling the district attorney's office to complain, the fact of the children's and English's subsequent disappearance, Hall's false explanation that English was caring for her ill mother in Vallejo and, most tellingly, Hall's outburst in court where he chastised the prosecutor for trying to serve the subpoenas after he thought he had made it clear to her that, "No means no." These are not actions indicative of Hall's unknowing or even passive involvement in English's causing his children's unavailability – quite the opposite.

21.

Indeed, if the forfeiture by wrongdoing doctrine has any substantive meaning, it certainly encompasses the willfully defiant actions of Hall and English to ensure Hall would escape justice by taking advantage of and exploiting his own children's minority to prevent them from testifying at trial. The trial court's rulings on this point were thus well within its informed discretion.

## III. Conclusion

We first hold that the trial court did not err in admitting the evidence of the children's statements to the police officers — either through the officers' direct testimony or from the recordings taken from their body–cameras — by finding them admissible under traditional Evidence Code hearsay exceptions. Secondly, we also hold that the trial court's rejection of Hall's Sixth Amendment *Crawford* claim was correct because after our independent review we too conclude that the children's statements were not testimonial under the Sixth Amendment.

Alternatively, but equally, we also hold that the trial court did not err in admitting the evidence of the children's statements because substantial evidence also supports its findings that Hall's *Crawford* claims had been forfeited by his intentional involvement in the children's absence at trial, thereby making his Sixth Amendment contentions unavailing from the outset. Consequently, there was no abuse of discretion.

# **DISPOSITION**

The judgment is affirmed.

SNAUFFER, J.

WE CONCUR:


LEVY, Acting P. J.


PEÑA, J.